Tribune Media Company v. Commissioner of Internal Revenue Ms. Bringer Good morning. May it please the Court, my name is Nora Bringer, and I represent the Commissioner of Internal Revenue in this appeal. In 2009, Tribune received $714 million for its disguised sale of the Chicago Cubs baseball team and other assets. This case concerns only the tax issues in 2009, and in that year, Tribune paid tax on $33 million of its gain. Tribune claimed that Tribune was at economic risk for $673 million in loans that funded the payment to Tribune for Tribune's sale of the Cubs' assets. Other than the claimed tax benefits, it made no sense for Tribune to give up 95% of the Cubs' assets and put itself on the hook for the vast majority of the payment it received in return. The party's arrangements made it look like Tribune had economic risk for the debt, the senior debt in particular, but the substance of the arrangement was otherwise. Under the party's arrangements for the Cubs' transaction, as Petitioner's senior guarantee was as low as zero and a maximum of 0.43% of the senior debt. The tax court erroneously found that to be irrelevant. I thought your own expert or one of your own experts testified that the guarantee was worth between $6 and $19 million. Your Honor, we're talking about the senior guarantee, and our position is that the guarantee of the senior debt is what's relevant to the Commissioner's appeal, and those numbers came from the Commissioner's expert's analysis of both guarantees, but that expert explained that if the subordinated debt was found to be equity, which is the case here, that the senior guarantee was effectively worthless, and our expert paid that at $30,000 in the low end to about a million dollars in the high end. So both experts are in agreement here that if we're just looking at the senior debt and the senior guarantee, then the risk is as low as zero and at most minimus. In upholding the tax treatment of the senior debt, the tax court failed to apply the plaintext of two anti-abuse regulations, and at a minimum this case should be remanded for the tax court to undergo the correct analysis. I'd like to start with the anti-abuse rule in Section 1.752-2J. The tax court incorrectly limited its analysis under the anti-abuse rule in subparagraph J to the hypothetical facts generated under the constructive liquidation test in subparagraph B. But that constructive liquidation test determines a partner's economic risk for recourse partnership debt except as otherwise provided in the regulation, and the anti-abuse rule in J is one of those other provisions that's an exception to the constructive liquidation test. The tax court erroneously found that the facts of the constructive liquidation test instead governed the anti-abuse rule in J, and that was incorrect. The anti-abuse rule applies to the actual facts and circumstances and considers the substance of the arrangement, but the tax court ignored the actual facts, circumstances, and substance in subsuming the anti-abuse rule to the facts generated by the constructive liquidation test. The tax court found it irrelevant that there was an extreme unlikely that the tribute would ever have to pay out on the senior guarantee. Everyone expected Chicago baseball holdings to pay its debt, and especially the senior debt, but the tax court assumed that CBH could not pay its debt. The fair market value of CBH's assets at the time of the transaction was $844 million, which is nearly two times the amount of the senior debt. Yet the tax court assumed that the Cubs would be deemed worthless. For all of these reasons, the tax court fundamentally misapplied the anti-abuse rule in J. The tax court also mistakenly thought that it had to assign the senior debt to a partner and decided that that partner was not RAC and instead assigned the debt to Tribune, but that's incorrect. Under this rule, an obligation may be disregarded or treated as the obligation of another person. There was no need to assign this to one of the two partners here. The tax court, in ignoring the actual facts and circumstances here, failed to analyze the substance of the arrangement. Under federal tax law, when you look at the substance of the arrangement, it means that you look to the real world facts, and as the Supreme Court said in the Frank Klein case, objective economic realities. Here, the tax court did not consider any of the facts or In Feldman, this court explained that for there to be economic substance in the federal tax context, the transaction must make a meaningful change to the party's economic position. Here, there is no meaningful change to Tribune's economic position from the senior guarantee. Why does the constructive liquidation language in the tax regulations then tell the court to assume that the value of the underlying asset has gone to zero? Why shouldn't it say, try to figure out what the actuarial value is? I ask this question, it should be clear, it looks like the form over substance argument is the commissioner's effort to make the constructive liquidation test go away, even though the constructive liquidation test is the commissioner's own test, and that troubles me. Sure. So the constructive liquidation test is easy to apply, it's straightforward, it's administratively simple, and in fact governs the assignment of recourse debt in the vast majority of cases. I think that's why we're here in only the second case concerning this anti-abuse rule. But Treasury promulgated that constructive liquidation test at the extreme circumstances under the constructive liquidation test can be manipulated through careful planning to make it look like there's risk when there really isn't an economic substance. So the anti-abuse rule, although rarely invoked, is a backup to those circumstances where the constructive liquidation test ends up with a partner being assigned risk for debt that isn't really there in the real world. So these two rules work together. And that's quite commonly the pattern in federal tax cases. Since 1935, the Supreme Court has upheld again and again, and many other courts have upheld, the idea that the commissioner, the Internal Revenue Service, can look behind the technical requirements and look to whether there's actual economic substance in a transaction. And here the tax court simply never looked to the real facts, and that's what the anti-abuse rule requires in Jay. The party's arrangements here did make it look, under the constructive liquidation test, like Tribune had risk. But in fact, the substance of the arrangements was quite different. Tribune's collection guarantee put up three extremely unlikely hurdles for Tribune to cross before Tribune would ever be on the hook for the senior debt. The first hurdle was a default by CBH on its debts. There were numerous protections in place to prevent that. The Cash Waterfall Agreement is one such protection, where revenues that were projected to be between 7 and 10 times the annual debt service in the senior debt flowed first to the senior debt. There was an Operating Support Agreement arrangement. Two different documents, a letter agreement, and then a loan agreement. Now under the letter agreement, the Ricketts parties, and that's a defined term in the agreement, agreed that at any time the commissioner could direct them to cause the transfer of funds to the baseball club in the form of an equity contribution or an unsecured subordinated loan. Those funds were intended to go to the operating expenses of the Cubs. Now while a loan was limited under those two agreements, there's no limit to the equity contributions that the commissioner could require. Leaving an unlimited pot of money available for operating expenses, which would free up money to pay the debt. The second hurdle is foreclosure, and we lay out in our briefs the many, many barriers to actual foreclosure on the Chicago Cubs baseball team. Major League Baseball testified that it had tools to avoid seizure of a team as collateral under all circumstances. Those tools included the Major League Constitution, the Debt Service Rule, and other ways that Major League Baseball would step in before it would allow a team to be foreclosed on. In addition, if foreclosure ever was allowed to occur, the senior debt was strongly over collateralized. As I mentioned earlier, at the time of the Cubs transaction, the fair market value of CBH was nearly two times the amount of the senior debt, and the possibility that there could be a foreclosure and that there would not be sufficient assets to satisfy the senior debt was nearly impossible, as is reflected in the testimony of the experts from both parties. I'd like to move on to the general anti-abuse rule unless there are further questions about the subparagraph check. So the commissioner also argued that the senior debt guarantee should be disregarded under the Subchapter K anti-abuse rule in 1.701-2. Now, to take advantage of the rules under Subchapter K of the Internal Revenue Code for Partnerships, there are several requirements in this regulation. One of them is that the partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose. The tax court, again, did not apply the plain text of this regulation. The tax court incorrectly held that the business purpose requirement does not apply to every agreement but rather to the function of the partnership as a whole, which would eviscerate this rule. But the tax court then went on to say, and in addition, I find that each of the question clauses has a business purpose. And you are not saying that any of those findings is clearly erroneous, so what's the point of attacking the first statement when it was backed up by the second and the second is not challenged? Your Honor, the tax court did eventually get to what it thought was an analysis of the risk under the senior guarantee. That was, in fact, clearly erroneous. And we point out some of the issues. I searched your brief for the phrase clearly erroneous. It does not appear in the brief. We may not have used that phrase, Your Honor, but we did explain in our brief that the tax court erroneously relied on evidence that was not relevant. That's part of the problem, at least for me. Your brief is written in large measure as if we were going to make the original decision. That is, what is an error? And that's true of legal arguments, but of factual arguments and characterizations, like whether clause X in an agreement serves a business purpose, our review is deferential. So I don't see how you get anywhere just by saying, well, you should do it differently. You have to show it's clearly erroneous. And as I say, that phrase does not appear even once in your brief. Even so, Your Honor, I think we did show that there was clear error in the tax court's brief discussion. By the way, that phrase appears exactly once, clear error in the statement of review, but not as applied to any of the tax court's findings. Well, I do think that we showed that the tax court's alternative analysis, once it finally got there, was clearly erroneous. First, the tax court erroneously looked to the risk on both guarantees. As we discussed earlier, the risk on the senior guarantee both experts testified was miniscule, and it was inappropriate and incorrect for the tax court to support and bolster Tribune's risk on the senior guarantee with its risk on the subordinated guarantee, when the tax court found that the subordinated debt was not debt at all. The tax court also should not have looked to 2016 documents from Standard & Poor's, which were prepared by an analyst who did not understand the transaction, who did not know the details of the transaction, and did the same thing the tax court did, which was lump together both tranches of debt here. The focus should have been on the senior guarantee, and Tribune's risk on that was as low as zero and, at best, de minimis and should be disregarded for federal tax purposes. I see that I'm well into my rebuttal time. Thank you. Thank you. Ms. Saharsky. Good morning. I'm Nicole Saharsky representing the Taxpayers' Tribune and the partnership. So the tax court correctly determined that this was a debt finance distribution, and it held a 10-day trial. It heard from 30 witnesses and 11 experts, and it made findings on all of these questions about the business purposes and the economic risk of loss. Did the tax court make a finding about the value of the guarantee as applied to the senior debt as opposed to the subordinated debt? Yes, the tax court made findings on both. It determined that both mattered because even if you don't treat the subdebt as debt for tax purposes, it was still a real obligation in the world. The Tribune would have to pay if the circumstances came to pass, so it said we should consider both of those the same way that S&P and others consider both. And the numbers that it gave based on the experts' testimony was for the senior debt, a valuation of approximately $1 million to $2 million. For both together, I think the numbers went between $13 million and up to $24 million. And the district court or, I'm sorry, the tax court made a number of findings very specifically after this trial that the guarantees had economic value. That's on page 113. Had a real-world effect on Tribune's credit rating. That's on 111. That there was a genuine concern that CBH may not have the cash flow, that it could decrease significantly so that the guarantees would be called. That's on page 100. Actually, the experts agreed that there was a risk of default that they put within four years between 4% and 5%, and that's a real risk of default. In terms of GAAP accounting, the tax court looked at that and said that even though it was remote for GAAP purposes, there was still economic value. And then, of course, it looked at the economic value of the senior and subdebt. That's on page 112. And so we think that analysis was entirely appropriate, supported by the record, the trial, and not clearly erroneous, all of those factual findings. Now, if we look at the regulatory questions, the specific regulatory requirements, and the legal arguments that the commissioner is making here, the bottom line is that Tribune's guarantees were real guarantees that could have been called. Everyone agrees that they were real guarantees. The commissioner says maybe they wouldn't have been called, but if they had been called, Tribune would have to pay. It had to have the money to be able to pay, and it always had that money available. It was like a life insurance policy. You hope you don't have to pay out on it, but if you need it, it has significant value, and that is essentially what Tribune was offering here as part of this package deal. And when it offered to parties to engage in the Cubs transaction, it proposed this package, and the package was we will transfer the Cubs' assets to the partnership, and we will also provide this guarantee. And the guarantee was supposed to be a sweetener that, you know, since Tribune had the money, it could provide this backup if something went wrong with the loans. In your view, what happens when the debt is repaid? Is that equivalent? And the guarantee then falls out. Is that equivalent to forgiveness of a loan? Well, from the taxpayer's perspective, so from Tribune's perspective, the tax is paid over time, and so while the guarantee is still in place, there is a certain amount of the gain on the Cubs' assets that are recognized as income every year, and tax is paid on that. Is that a result of the conversion back to C status, or is it a different source? Well, as a general matter, the effect of something being a debt finance distribution as opposed to a deferred sale is deferral of the tax as opposed to paying it all in one year, which is 2009. As Your Honor points out, there was a short period of time right after this transaction where Tribune was an S corporation, and then because of the bankruptcy, it reverted to a C corporation. From the period of time when it was an S corporation before it became a C corporation again, the gain was treated as some amount of it was treated as income, but the owner of the S corporation didn't pay taxes on its income because it was an ESOP, an employee stock ownership plan. And so for that period of time, although the gains were allocated as income, tax wasn't paid on them. But then after Tribune became a C corporation again, every year the amount of the gain was recognized, allocated, these remedial allocations as income, and Tribune paid tax on it. And eventually, actually, there became a point in 2018 where the guarantees were forgiven, essentially, or no longer, Tribune no longer had to give the guarantees. It paid tax at that point. And then there came a point in 2018-29 where Tribune sold its 5% remaining interest in this partnership, and then it paid tax at that point. So Tribune is paying tax on this. It's not as though this is some tax avoidance mechanism. This is something that Congress recognized. Well, tax deferral is, to an extent, tax avoidance. It depends on the rate of, basically, the social rate of interest. But, yeah, I just wanted to understand exactly how you saw when the gains would be recognized. Certainly, and this is something that- And I think I understand it. Yeah, I'm sure you do. This is something that Congress recognized in terms of wanting to permit this type of tax deferral for debt finance distributions. So there was this case that came out in the early 1980s, the Refond case, that did not treat a guarantee as a liability that could be used for purposes of a debt finance distribution. Congress, in the massive tax reform act in 1984, put into the public law Treasury Department promulgate regulations that account for guarantees to be used as part of a debt finance distribution and do it without regard to this decision in the Refond case. So we know that Congress specifically contemplated that guarantees could be used in this way for debt finance distributions, and that if you turn to the Treasury Department regulation, that's exactly what it does. And so, just to turn to the regulations here, because I think there's a- the tax court completely understood how these regulations work. I mean, the bottom line is, because these are real guarantees, there is not abuse under the specific anti-abuse rule or under the general anti-abuse rule. So if I start with the first one, the specific anti-abuse rule, that's the one that's in the regulation 1.752.2. That regulation starts with the constructive liquidation test. It says, let's assume that everything goes badly and who- the partnership has no assets. All of the liabilities come due. Cash- it's cash is worthless. Is there any partner that has to pay? And here, because of the guarantee, which is a recourse liability to Tribune, Tribune would have to pay. Everyone agrees, worst case scenario, Tribune would have to pay. And so then there's this other provision in J, which is the anti-abuse rule. And it asks, you know, essentially, despite the legal agreement, the guarantee, is there some reason that the parties have agreed to eliminate their risk of loss or to create the appearance of a risk of loss where, in fact, none exists? And I'm just looking at the exact language of this provision. It's that the facts and circumstances have to indicate that there's a principal purpose of an arrangement between the parties to either eliminate the partner's economic risk of loss or create the appearance of the partner bearing the economic risk of loss where, in fact, it doesn't exist. Well, what is that about? It is about a situation in which there really is no risk. There is no risk because the partners had some kind of side agreement. And we know that because there's an example that's in the regulation just a few lines down, and it gives an example of what would be abuse under the circumstances. And in that situation, one of the partners, A, has taken on that it will pay for the partnership's losses, but it doesn't have any money to do it because it's a subsidiary and its parent company made sure that it would not have any capital to pay that. So in those circumstances, they said, well, we're not going to allocate that liability. That's an abusive arrangement because there's no money to pay. There's also the Canal Corp decision that the tax court addressed, which was a similar situation. You have a subsidiary that has no money to pay if the liability came due, and then also there was an arrangement where the subsidiary would be paid back. And so there was just no economic risk of loss there. And there's a reason, I think, in this regulation that the question is risk or no risk. It's not magnitude of the risk, likelihood of the risk, and that's because of the need for certainty. I mean, these rules are about allocating losses or liabilities to partners. Partners need to know this for all different kinds of purposes, even figuring out their income every year. It's not just about debt finance distributions. And the reason that we have the constructive liquidation test is that it provides certainty, as the government says. And here, the rule that the government's suggesting under the anti-abuse rules, it's like some amount of risk isn't good enough. We don't know how much. They never tell us what the rule is. It's just some amount of risk isn't good enough. And that's not what this regulation says. It's not what the example says. And, frankly, it would create a lot of problem because there are a lot of guarantees that companies enter into, and now they wouldn't know if the risk is good enough or not. So this is really, in our view, just a made-up test by the government that would destroy the certainty that exists now. I'd like to talk separately about the general anti-abuse rule that the commissioner is relying on. So this is a provision that says that each partnership transaction or series of related transactions must be entered into for a substantial business purpose. This is the Regulation 1.701-2. And the tax court in this circumstance first interpreted the regulation because there was a disagreement between the parties in terms of how should you interpret the regulation, and then made factual findings. The interpretive question was, do you look at the overall transaction, the Cubs transaction, for a substantial business purpose, or do you look just at the guarantee? And the tax court said, looking at the text, looking at the examples the Treasury provided, you look at the overall transaction. The overall transaction here was the formation of the partnership, the taking out of the loans, the giving of the guarantees. All of that had a substantial business purpose, which was to transfer this ownership of the Cubs and form this new organization. And so that's our view, too, is that that's the right way to look at this regulation. But the tax court said, even if you look at it the other way and ask, does the guarantee itself have to have a substantial business purpose, I find that it does because it ensured that those loans were going to be paid, and it had economic value for all of those reasons that I talked about earlier with respect to its effect on what it would be worth according to the experts, its effect on Tribune's credit rating, there being a real risk that, in fact, there would be a default and the guarantee would be called. And those are all factual findings by the tax court that are not clearly erroneous. And so there's just no basis here, we think, under either of these anti-abuse rules to invalidate this transaction. I mean, really, both of these rules at their heart are asking, like, is this a real transaction? Did it have any economic effects out in the world? And the answer is absolutely yes. These debts and this guarantee were accounted for in Tribune's financial statements. They were accounted for by S&P. The experts all agree that they exist, and the tax court made substantial findings on all of these things that the government just doesn't refute. And we think if the government's view of the regulations were accepted, it would essentially throw these regulations into disarray because there would come a point at which a guarantee is just not good enough anymore. I'd like to just turn briefly, if I can, to the debt versus equity issue, which is the issue on which we cross-appealed. So the reason that we cross-appealed here is that the tax court's holding, it just doesn't reflect the reality of over 10 years of operating in this arrangement that everyone understood this to be debt. And there is just a mountain of objective evidence here in terms of how the parties understood the subordinated debt. And just to be clear, we are not asking you to find facts or revisit the tax court's facts. For the most part, the historical facts here are undisputed. For the most part, except that the tax court has got this 13-factor. I refuse to call it a test. It's got this 13-factor list, and it says, well, I got a little of this, and that's positive, and I got a little of that, and it's negative. It sounds like it's reached a characterization that can only be called a decision of fact. How does one avoid that? Consistent with your argument that the tax court's other findings of fact should be accepted. Right. I absolutely understand the question. First of all, I think the analysis that is appropriate is what this court has done in prior cases, which is you don't have to look at all 13 factors. You just look at the ones that make sense in this case. Or maybe you can find two more. How is it anything other than a finding of fact how these things weigh up? Right. This ultimate question, whether it's factual or legal, this court has said both. There are precedents from this court that say both, and this court has acknowledged that it has said both. We think that it ultimately is legal, but we're not asking you to revisit that determination here. What we're asking you to do is to correct the tax court's legal errors because we think the tax court had some pretty serious legal misunderstandings that influenced the way that it made this final determination, and those are things that are reviewed de novo. I think everyone agrees that legal errors are reviewed de novo. So just to address what those are, first of all, the tax court treated the fact that the subordinated debt was subordinated as dispositive of it being equity as opposed to debt, and that just wasn't right. It can be a relevant fact that the debt is subordinated if the effect of subordination is that it is paid on par with equity, but if it's still paid on par with, for example, the general unsecured debt, which is what happened in this case, then it's debt. So the mere fact of subordination just doesn't make something equity as opposed to debt. The question is, like, how is it subordinated? How will it be paid? And the circumstances in this case made clear that it was paid before equity on par with that other debt. The second legal error was the treatment of related parties. The tax court here essentially assumed that related parties can't create real debt. That's just not reality at all. Related parties create real debt all the time, like look at parents and subsidiaries. And certainly here what the tax court should have done is look at the terms of the agreements, which made clear that there was a certain repayment of principal and interest, the terms, the consistent practice of repayments, et cetera. And then the third thing, which we think is the most significant, is the third-party evidence here. Unlike most cases, you have a lot of interested third parties who cared about whether this subordinated debt was debt or equity. It mattered to Major League Baseball and to the three-fourths of the teams that had to approve this transaction because they were worried about how much debt the partnership potentially was going to take on. You also had ratings by S&P. You had the senior debt holders specifically limiting the amount of this subdebt, which they wouldn't have done if it was equity, and you had the bankruptcy court understanding that it was debt. So, you know, in those circumstances where the tax court made those errors, we really think that you should at least remand, if not find in our favor. I see that I'm at the end of my time. I'm happy to answer questions if there are any. Thank you. Thank you. Ms. Springer. Thank you, Your Honor. I'd like to touch on a few things, turning back to the senior debt and the commissioner's appeal regarding the senior guarantee. The fact is that the tax court never looked at the real-world facts with respect to the senior guarantee, which is required under both of these anti-abuse rules. The tax court, in its analysis of the subparagraph J rule, looked just to the hypothetical facts generated by the constructive liquidation test. And when it turned to the subchapter K anti-abuse rule, at best, when it finally got to the senior guarantee, as we discussed earlier, it looked at evidence regarding both guarantees and never considered the zero to de minimis risk that Tribune actually had on that guarantee. And the senior guarantee is all that matters when you're looking at whether Tribune's treatment of the senior debt was correct. There is no reason for the senior guarantee in the real world other than tax benefits. Yes, it was built into the transaction from the beginning, but there's no evidence that it had any impact on the terms or the amount of debt that the lenders put forth to CBH. And, in fact, the evidence in the record is the opposite of that. Tribune concluded that its guarantees had no effect on the amount and the terms of the debt, and that there was no benefit to the bidder, to the Rickettses and to CBH from the senior guarantee. And so there's no business purpose for that guarantee. It made no difference to this deal other than making it appear as though Tribune had economic risk for the debt, when, in fact, the truth is that it did not. Are there any other questions the panel has for me? Did you want to address the cross-appeal briefly? There were three legal errors that were raised after the debate about whether the tax court's decision was based on factual findings or contained legal errors, so if you could just focus in on the three legal errors. The treatment, in general, of the subordinated debt as equity, sort of as a categorical matter, that's one of the legal errors that's been claimed. Sure, Your Honor. So the standard of review for that is clear error, and it's a facts and circumstances test that looks at the whole picture. With respect to one of the issues that was raised, the related party issue, it's certainly possible for related parties to enter into genuine debt. The petitioners cite two cases that involved a parent corp and a subcorp for those debts. Here, the situation is quite different. The related parties are controlled by close members of the same family, and it's appropriate for the tax court to look at those relationships and consider whether one entity, which was funded and controlled by Marlene Ricketts, for example, ever would have enforced any enforcement rights that it had at the very end of the line against the entity owned by the family trust. So certainly related parties can create genuine debt. Here, their parties are so close and their interests are so aligned that the tax court correctly found that the subordinated debt was equity and not debt. Are there other particular issues that you'd like me to address, Your Honor? That was one of the major legal errors that was claimed in your position. As I understand it, it's that it wasn't a legal error. It was just a factual finding, a difference of opinion about a factual finding. Yes, Your Honor, that's correct. It's certainly perfectly permissible for the tax court to keep in mind the close family relationships that controlled all of the entities that were involved in the debt here. Understood. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.